# Exhibit A

<table>
<tr><td>

**DISTRICT COURT, CITY AND COUNTY OF DENVER**
**STATE OF COLORADO**

1437 Bannock Street
Denver, CO 80202

</td><td>

DATE FILED: June 15, 2018 10:37 AM
FILING ID: 1ECFC9BF96824
CASE NUMBER: 2018CV32237

</td></tr>
</table>

|  |  |
|---|---|
| **PLAINTIFF:**<br>TREVOR L. JONES, an individual,<br><br>v.<br><br>**DEFENDANTS:**<br>HEALTHONE d/b/a THE COLORADO HEALTH<br>FOUNDATION, a Colorado nonprofit corporation; JEFFREY<br>PICKARD, an individual; BRIAN G. DWINNELL, an<br>individual; and GLENN LEVY, an individual. | ▲ **COURT USE ONLY** ▲ |
| **ATTORNEYS FOR PLAINTIFF:**<br>GOODSPEED & MERRILL<br>Miro Kovacevic, #35981<br>Scott W. Drusch, #42494<br>7800 East Union Avenue, Suite 600<br>Denver, CO 80237<br>Telephone: (720) 473-7644<br>Email: mk@goodspeedmerrill.com<br>        sdrusch@goodspeedmerrill.com | **Case No.:** 2018CV_____<br><br>**Division:** ___ |
| **COMPLAINT AND JURY DEMAND** ||

Plaintiff Trevor L. Jones, by and through his undersigned counsel, Goodspeed & Merrill,

hereby states his Complaint against Defendants as follows:

## PARTIES, VENUE, AND JURISDICTION

1.    Plaintiff Trevor L. Jones ("Plaintiff") is an individual who resides in Douglas

County, Colorado.

1

2.      Defendant HealthONE d/b/a The Colorado Health Foundation ("CHF") is a Colorado nonprofit corporation and its principal offices are located in the City & County of Denver, Colorado.

3.      Defendant Jeffrey Pickard, M.D. ("Dr. Pickard") is an individual who, on information and belief, resides in the City & County of Denver, Colorado.

4.      Defendant Brian G. Dwinnell, M.D. ("Dr. Dwinnell") is an individual who, on information and belief, resides in Arapahoe County, Colorado.

5.      Defendant Glenn Levy ("Mr. Levy") is an individual who, on information and belief, resides in the City & County of Denver, Colorado.

6.      Venue is proper before this Court pursuant to C.R.C.P. 98(c) because at least one of the Defendants resides in the City & County of Denver, Colorado.

7.      The Court has personal jurisdiction over the Defendants pursuant to C.R.S. § 13-1-124(b).

## GENERAL ALLEGATIONS

8.      This dispute concerns CHF, Drs. Pickard and Dwinnell, and Mr. Levy's (collectively, the "CHF Defendants") pre-mediated and tortious, collective scheme to destroy Plaintiff's promising medical career as a dermatologist.

### CHF's Internship Program

9.      CHF runs a Transitional Internship Program (the "Program" or the "Internship Program"), which is operated at the Presbyterian/St. Luke's Medical Center ("PSL"), in Denver,

2

Colorado.

10.     The Internship Program is a one-year, educational and preparatory program for recent medical school graduates who will enter specialized residencies the following year.

11.     Each year, the Internship Program employs twelve interns for a year-long session. Each intern is allegedly expected to participate in twelve, one month long rotations in various areas of medicine. The purported curriculum includes: five inpatient rotations (four internal medicine and one hematology/oncology/bone marrow transplant service), one emergency medicine rotation, one ambulatory or outpatient rotation, one research rotation, one business in medicine rotation, one surgery rotation, and two elective rotations.

12.     The Internship Program's Director is Dr. Pickard. Dr. Dwinnell is CHF's Director of Medical Education. Mr. Levy is a Senior Director with CHF's Medical Education Department. Drs. Pickard and Dwinnell are both Mr. Levy's subordinates.

### *Plaintiff's Background and Vehicle Collision*

13.     After observing a close family member fight melanoma while he was in college, Plaintiff decided that he wanted to be a dermatologist.

14.     In pursuit of this goal, Plaintiff graduated with a Doctor of Medicine from the University of Arizona, College of Medicine on May 15, 2015.

15.     Due to his excellent academic record and application, the National Resident Matching Program ("NRMP") matched Plaintiff with the Internship Program to start in June, 2015.

3

16.     The NMRP further matched Plaintiff to start with the Dermatology Residency Training Program with the Carver College of Medicine Department of Dermatology at the University of Iowa (the "University of Iowa") in July, 2016.

17.     The University of Iowa's medical school is one of the top ranked medical schools in the country.

18.     Dermatology is one of the highest paying specialties for medical doctors.

19.     Plaintiff commenced his internship and employment with CHF through the Internship Program in June, 2015.

20.     On August 1, 2015, just a few weeks after the Program began, a motor vehicle struck Plaintiff as he jogged through a crosswalk.

21.     The impact resulted in a smashed windshield and a severely injured and unconscious Plaintiff laying on the pavement. He was 28 years old.

22.     As a result of the collision, Plaintiff sustained significant injuries, including a traumatic brain injury, which caused memory issues, sensitivity to light, difficulty reading and seeing far distances, speech problems, and loss of hearing in his right ear. He also suffered a broken rib and injuries to his right leg, right hand and arm, and experienced numbness in his face and tongue.

23.     Plaintiff's injuries were so significant that he spent the next forty-nine days after the collision as an inpatient at Denver Health and then Craig Hospital.

24.     On September 18, 2015, Plaintiff left Craig Hospital and embarked on an

extensive rehabilitation program at Sky Ridge Medical Center, in Lone Tree, Colorado. This program, which lasted until March, 2016, was specifically designed to ensure he was capable to return to the Internship Program in June, 2016.

25.     Due to his injuries, the NMRP granted Plaintiff a one year deferment of his entry into the Internship Program until June, 2016, and the University of Iowa until July, 2017, respectively.

26.     By the spring of 2016 and due to the help of Denver Health, Craig Hospital, Sky Ridge, a team of personal specialists, and other healthcare professionals, Plaintiff was cleared to reenter the Internship Program.

27.     On March 15, 2016, Plaintiff's personal injury attorney filed a lawsuit against the driver who struck him. The driver's insurance company provided her with representation. See Jones v. Masterson, 2016CV30900, City & County of Denver District Court, Colorado (the "Collision Action").

28.     In medicine, patients' medical information and records are usually stored in Electronic Medical Records ("EMR") systems hosted on a computer.

29.     Doctors use EMR systems to record observations, notes, and recommendations about the patient, as well as learn about the patient from other observers. In order to access or input information into the system, an individual needs to be able to read a computer screen.

30.     During his rehabilitation with Sky Ridge, Plaintiff learned that he had difficulties reading and using a certain EMR system known as Meditech, although he did not have issues

reading other types of computer screens or EMR systems.

31.     Plaintiff understood that PSL's inpatient services used the Meditech system. Starting in April, 2016, Plaintiff repeatedly informed the Program about this issue.

### CHF Defendants Improperly Disclosed Plaintiff's Medical Information and Tortiously Attempted to Force Him from the Internship Program

32.     The CHF Defendants were well aware of Plaintiff's disabilities and the difficulties he would face reentering the Program. In fact, Dr. Pickard visited Plaintiff numerous times in the hospital and during his rehabilitation.

33.     After the accident, the CHF Defendants improperly and falsely decided that Plaintiff would not be able to become a dermatologist, and became determined to dissuade Plaintiff from continuing to become a dermatologist.

34.     Instead of focusing on appropriate reasonable accommodations to address Plaintiff's disabilities, the CHF Defendants dedicated their attention to improperly researching Plaintiff's medical conditions and prognosis to confirm their own "diagnosis" that Plaintiff was not capable of becoming a dermatologist.

35.     For example, although numerous health care professionals had opined that Plaintiff was fit and ready to return to the Program, Dr. Pickard unilaterally decided to refer Plaintiff to the Colorado Physician Health Program ("CPHP") to have it evaluate whether Plaintiff was physically and mentally capable of returning to the Program.

36.     Dr. Pickard made the referral without conferring with Plaintiff. Dr. Pickard further explicitly conditioned Plaintiff's return to the Program on the successful completion of CPHP's

evaluation over Plaintiff's protests.

37.    Plaintiff attended his appointment with CPHP in March, 2016. While Plaintiff was at CPHP, he was given a full medical and psychiatric evaluation. He was also required to execute a release so that CPHP could share his confidential and sensitive medical information with Drs. Pickard and Dwinnell.

38.    Although disputing its necessity, Plaintiff executed the release because he felt he had no other choice but to sign the release. Further, Drs. Pickard and Dwinnell were doctors and his superiors at the Program. He trusted them and reasonably believed that they would treat his medical information as confidential.

39.    On May 23, 2016, CPHP determined that Plaintiff was able to return and recommended that he be permitted to reenter the Internship Program the following month. Drs. Pickard and Dwinnell were provided this information.

40.    On June 1, 2016, Plaintiff met with the CHF Defendants to discuss his return to the Internship Program. Plaintiff described his disabilities, which included visual issues and dexterity problems with his right hand. He further detailed the reasonable accommodations directed by his treating physicians that he would need when he returned to the Program, including a maximum workweek of forty hours, no night shifts, additional time for him to complete certain tasks, and time to allow his hand to continue to strengthen.

41.    Plaintiff rematriculated into the Internship Program as scheduled on June 23, 2016.

42.     Plaintiff encountered no issues in the first twelve days of the Program. Nonetheless, on July 5, 2016, Dr. Pickard again referred Plaintiff to another doctor – this time an optometrist who graduated from the Internship Program under Dr. Pickard.

43.     Because he already had multiple optometrists caring for him, Plaintiff protested. Again, however, Dr. Pickard made it clear that this was not optional. Nonetheless, when Plaintiff went to meet the optometrist, she noted that she was unqualified to evaluate him.

44.     On or about August 16, 2016, Dr. Pickard asked Plaintiff for permission to speak with Plaintiff's personal optometrist to discuss her prognosis for Plaintiff's vision. Dr. Pickard required Plaintiff to execute a release so that he could access Plaintiff's medical records. Plaintiff consented only because he did not feel as if he had a choice.

45.     On October 5, 2016, Plaintiff met with Drs. Pickard and Dwinnell. Dr. Pickard explicitly stated that he did not believe that Plaintiff would ever become a dermatologist. He further recommended that Plaintiff take one of his rotations at the University of Iowa just so he would understand how his disabilities would prevent him from becoming a dermatologist.

46.     The CHF Defendants further intentionally ignored Plaintiff's reasonable request and need to limit his work schedule.

47.     In a blatant attempt to drive Plaintiff from the Program, the CHF Defendants ignored Plaintiff's reasonable requests for accommodation, without providing any alternatives, and made Plaintiff work 280 hours in his first inpatient rotation (which exceeded the amount Plaintiff's doctors recommended by more than 100 hours).

8

48.     When the CHF Defendants were unable to discover anything that would prevent Plaintiff from becoming a dermatologist and failed to drive him out of the Program through their outrageous conduct, the CHF Defendants changed their tactics.

49.     In a series of communications, they improperly divulged confidential and false information regarding Plaintiff's medical condition to the University of Iowa in order to persuade it to deny him entry into its dermatology program.

50.     In the weeks leading up to his reentry to the Program, Plaintiff decided to start establishing a rapport with his future boss. In May, 2016, Plaintiff drove to Iowa to meet with the Program Director of the University of Iowa's Dermatology Program, Mary Stone M.D. ("Dr. Stone").

51.     Despite being aware of Plaintiff's accident and the extent of his injuries, Dr. Stone expressed no concern over Plaintiff's ability to enter, participate, and succeed at the University of Iowa's program during this initial meeting.

52.     On August 31, 2016, Dr. Pickard met with Plaintiff to discuss his performance during his first inpatient rotation. During this meeting, Dr. Pickard mentioned that he intended to contact the University of Iowa to discuss Plaintiff's training. Dr. Pickard did not mention that he would talk to Dr. Stone about anything else, especially Plaintiff's disabilities or medical conditions.

53.     A few weeks later, on October 5, 2016, Drs. Pickard and Dwinnell told Plaintiff that they and Mr. Levy had spoken with Dr. Stone. They stated that they discussed the possibility of Plaintiff completing a rotation of his internship with the University of Iowa. They further

9

admitted that that they had discussed Plaintiff's visual disabilities with Dr. Stone.

54.     Plaintiff never consented to CHF sharing his medical information with the University of Iowa.

55.     Based upon the CHF Defendants' comments, Dr. Stone became very concerned with Plaintiff's ability to see patients' skin and become a dermatologist.

56.     The CHF Defendants' communications to Dr. Stone had the intended impact. On November 22, 2016, Dr. Stone sent an unsolicited letter to Plaintiff and, for the first time, conveyed concerns about Plaintiff's abilities to be a resident. A true and correct copy of this letter is attached hereto and incorporated herein by reference as **Exhibit 1**.

57.     Contrary to Dr. Pickard's claim on August 31, 2016 that he intended to call Dr. Stone only to determine whether Plaintiff could complete a rotation at the University of Iowa, Dr. Stone indicated that they had contacted her in order to share his disabilities and sensitive medical information. See **Exhibit 1**.

58.     On January 13, 2017, Dr. Stone wrote an email to Plaintiff and stated: "As patient safety must be our first priority, and all residents must be able to successfully complete all aspects of training in order to safely care for patients, please let us know if any of these issues could impact your training." A true a correct copy of this email is attached hereto and incorporated herein by reference as **Exhibit 2**.

59.     This email was unsolicited by Plaintiff and further confirms that the CHF Defendants conveyed false information regarding Plaintiff's visual disabilities to Dr. Stone and

the University of Iowa.

60.     In response to this email, Plaintiff spoke with Dr. Stone via telephone. She confirmed that Drs. Pickard and Dwinnell and Mr. Levy had informed her about his medical conditions. She further stated that based upon the information she had received from the CHF Defendants, Plaintiff should find another specialty.

61.     On March 17, 2017, Dr. Stone sent another letter to Plaintiff. A true a correct copy of this email is attached hereto and incorporated herein by reference as **Exhibit 3**.

62.     Therein, Dr. Stone stated that based upon the information provided by the CHF Defendants, she doubted whether Plaintiff would be able to perform the essential functions of his residency and that his medical conditions posed a safety risk.

63.     Dr. Stone's comments confirm that she believed that Plaintiff's impairments were permanent. None of Plaintiff's physicians ever made this conclusion. Plaintiff had also never conveyed this opinion to anyone.

64.     Dr. Stone's letter further establishes that the CHF Defendants intentionally misled Dr. Stone regarding the extent of Plaintiff's visual impediments. At that time, Plaintiff's visual disability prevented him from using Meditech on his own. However, the University of Iowa does not use Meditech – it uses EPIC. This is a system that Plaintiff had no issue using. Dr. Stone's statements reflect that she believed that Plaintiff's visual issues applied to more than just Meditech. Her comments further illustrate that she believed that Plaintiff was unable to see a patient's skin. These conclusions about Plaintiff's medical conditions are patently false.

11

65.     Due to the CHF Defendants' representations, the University of Iowa sought a waiver of its match with Plaintiff from the NMRP.

66.     In order to support the request, the NMRP contacted and obtained information from CHF. Upon information and belief, the NMRP granted the University of Iowa's request based upon the false and misleading information provided by CHF.

67.     Through their intentional conduct, the CHF Defendants improperly and without authority disclosed Plaintiff's sensitive medical information to third-parties. The CHF Defendants further disclosed false information to Dr. Stone and the NMRP. The CHF Defendants' conduct ultimately caused Plaintiff to lose his place at the University of Iowa and a career in dermatology.

### The CHF Defendants Defrauded Plaintiff

68.     Plaintiff is disabled. The CHF Defendants were well aware of Plaintiff's needs and requests for reasonable accommodation.

69.     Although Plaintiff was cleared to re-enter the Program by the CPHP, he needed additional time to fully heal from the injuries he suffered as a result of the vehicle collision.

70.     Despite being aware of Plaintiff's disabilities and need for accommodations, the CHF Defendants denied his requests and refused to enter into the interactive process to ascertain any alternatives.

71.     The focus of Plaintiff's accommodations concerned the inpatient rotations. The non-inpatient rotations utilize EMR systems known as "EPIC" and "eClinicals," while the

inpatient rotations use Meditech.

72.     Plaintiff was able to utilize EPIC and eClinicals with little difficulty and, in fact, did very well on each outpatient rotation. Plaintiff's disabilities made it very difficult to use Meditech.

73.     Plaintiff's first rotation was in outpatient, where he did very well.

74.     Plaintiff's second rotation was in inpatient, which started on July 23, 2016 and ran through August 22, 2016. Although CHF was well aware of Plaintiff's disabilities and requests for reasonable accommodations long before the rotation, CHF ignored them all and offered him no alternatives.

75.     Plaintiff was required to work night shifts and ultimately was required to work 280 hours that month, nearly doubling the amount recommended by his doctors. In addition to the inappropriate workload, Plaintiff experienced significant issues accessing the Meditech EMR system.

76.     CHF's failure to provide Plaintiff with any reasonable accommodations significantly impacted his health and his ability to perform in the inpatient rotation.

77.     Plaintiff's third rotation was an elective, which ran from August 23, 2016 through September 22, 2016. Despite having over approximately six months to do so, Drs. Pickard and Dwinnell finally scheduled a meeting with Plaintiff and PSL's information technology employees to discuss what accommodations they could employ with Meditech immediately after Plaintiff's inpatient rotation. The employees claimed that they could not provide accommodations to enable

Plaintiff to utilize Meditech on his own. CHF failed to discuss or offer any alternatives.

78.     Plaintiff's fourth rotation was in emergency medicine at Denver Health, which ran between from September 23, 2016 until October 22, 2016. Plaintiff did well on the rotation and was provided positive feedback. Like the outpatient rotations, this rotation utilized EPIC as its EMR system, not Meditech.

79.     In September, 2016, during Plaintiff's fourth rotation, CHF informed Plaintiff that he was being assigned a "scribe" during the upcoming inpatient rotation. The scribe was a contract nurse at PSL and lacked any training to be a scribe for a physician. She was available only during daytime shifts in inpatient rotations, thus leaving Plaintiff without any accommodations during his night shifts.

80.     CHF failed to give any guidelines or instructions to either the scribe or Plaintiff regarding the scribe's duties and the protocols to be used.

81.     Plaintiff did not have another inpatient rotation until his eighth rotation from January 23, 2017 through February 22, 2017.

82.     In the weeks and months after his first two inpatient rotations, Plaintiff started experiencing blurred vision and pain in his right eye. On February 8, 2017, Plaintiff had an emergency appointment with his optometrist who diagnosed a corneal ulcer. That same day, due to the scribe's inappropriate behavior, Plaintiff was forced to discontinue using the scribe.

83.     CHF directed Plaintiff to attend a meeting to be held on February 10, 2017. At the meeting, the CHF Defendants informed Plaintiff that he had been placed in a remediation plan

14

due to alleged concerns over his performance. A remediation plan is a process by which the Program purports to assist interns with alleged performance issues.

84.     The CHF Defendants failed to adhere to its own protocols and procedures in placing Plaintiff in the remediation plan.

85.     Despite having alleged notes or records from virtually every other meeting, CHF failed to make or otherwise produce any record of the February 10, 2017 meeting.

86.     In a follow up meeting on February 13, 2017, CHF confirmed that Plaintiff's participation in the remediation plan was a requirement to his continued involvement with the Program. Plaintiff informed CHF personnel about his corneal ulcer at these meetings with no response.

87.     On March 1, 2017, Plaintiff met with the CHF Defendants and additional personnel to review his performance during the previous nine days in remediation. The meeting became very heated when a PSL hospitalist yelled at Plaintiff and falsely claimed that the reason Plaintiff was in remediation was because he had observed Plaintiff's performance. When Plaintiff again raised the issue of his corneal ulcer, Dr. Pickard admonished him that, unless he intended to take leave, not to use it as an excuse. Finally, Plaintiff repeatedly raised his concern that some of the issues raised by CHF, which purportedly resulted in him being placed into remediation, may have been caused by his scribe. These appeals went ignored and were never investigated.

88.     Due to the severity of his corneal ulcer, which was brought on by CHF's failure to provide the requested reasonable accommodations, Plaintiff was ultimately forced to take a leave of absence. Effective March 24, 2017, Plaintiff began his leave pursuant to the Family and

15

Medical Leave Act ("FMLA") through June 15, 2017.

89.     Before taking FMLA leave, CHF never asked Plaintiff whether he required reasonable accommodations in relation to his corneal ulcer.

90.     As of the time his FMLA leave began, Plaintiff only had to complete three more rotations before finishing the Program's requirements.

91.     As the time for Plaintiff's return to the Program approached, he and CHF started communicating regarding his return.

92.     These discussions dragged on. In fact, CHF would take literally months to respond to Plaintiff's email requests for reasonable accommodations. For example, Plaintiff responded to inquiries regarding his requests for reasonable accommodations and his medical condition on August 7, 2017. CHF did not respond for more than six weeks; i.e., September 20, 2017. And, far from detailing exactly what accommodations would be provided, CHF stated that it would require Plaintiff to complete an inpatient rotation, but failed to provide any solutions to the issue with Plaintiff using Meditech. CHF further rejected Plaintiff's requests concerning the number of hours he worked.

93.     The CHF Defendants intentionally delayed Plaintiff's return to the Program.

94.     Eventually, as Plaintiff waited for additional information and response, he received information from CHF indicating that it would send him COBRA information. In fact, in the beginning of January, 2018, ten months after he went on FMLA leave, Plaintiff's medical insurance was denied, thus confirming that Plaintiff had been terminated effective January 1,

16

2018.

95.     The CHF Defendants knew of their obligation to provide Plaintiff with reasonable accommodations. Instead of seeking to accommodate his disabilities, the CHF Defendants forced Plaintiff to endure numerous unnecessary doctor appointments, compelled him to work almost double the amount his doctors directed, which caused his corneal ulcer, divulged his sensitive medical information to third-parties, and spread false and misleading medical information to third-parties. They did this all in a patent attempt to drive Plaintiff from the Program because they did not believe he could be a dermatologist.

96.     As the discussions amongst the parties regarding Plaintiff's return to the Program dragged on in the summer and fall of 2017, Plaintiff repeatedly asked for reasonable accommodations in accordance with his doctors' directives, including only having to complete three more outpatient rotations, which was acceptable to the Accreditation Council for Graduate Medical Education (the "ACGME").

97.     On December 11, 2017, CHF denied the request and stated that Plaintiff would have to complete inpatient rotations to complete the Internship Program.

98.     Due to this denial, Plaintiff believed that he would never be able to complete the Internship Program or obtain his medical license.

99.     On January 22, 2018, Dr. Pickard was deposed in the Collision Action.

100.    Without previous notice and despite months of rejecting Plaintiff's requests, Dr. Pickard confirmed under oath that all of Plaintiff's requested reasonable accommodations would

be available to him. Dr. Pickard further testified that Plaintiff could return within a week.

101.    The next day, Plaintiff emailed Dr. Pickard to confirm that the reasonable accommodations he requested would be made in order to allow Plaintiff to complete the Program. A true and correct copy of this email is attached hereto and incorporated herein by reference as **Exhibit 4**.

102.    Dr. Pickard responded on January 26, 2018. A true and correct copy of this email is attached hereto and incorporated herein by reference as **Exhibit 5**. Therein, the CHF Defendants confirm that all of Plaintiff's requested reasonable accommodations would be provided.

103.    By virtue of Dr. Pickard's deposition testimony on January 22, 2018 and his January 26, 2018 email, the CHF Defendants represented that they would provide Plaintiff with all requested reasonable accommodations in order to complete the Program.

104.    By virtue of the CHF Defendants' representations that all requested reasonable accommodations would be provided, the CHF Defendants confirmed that Plaintiff would not be required to complete anymore inpatient rotations because CHF was unable to provide certain of the requested accommodations during inpatient rotations (e.g., certain software that Plaintiff used to access outpatient EMRs is incompatible with the inpatient EMR, Meditech.).

105.    The CHF Defendants' representations that Plaintiff would not be required to complete any further inpatient rotations is substantiated by the fact that, as provided in Dr. Pickard's January 26, 2018 email, Plaintiff's next rotation was changed to outpatient, even though it was supposed to be inpatient.

18

106.     As the CHF Defendants are aware, Plaintiff was concerned that he would never complete the Program due to his disabilities and CHF's refusal to provide reasonable accommodations. Plaintiff sought significant damages in the Collision Action to recover the damages as a result of losing a career as a dermatologist. With the CHF Defendants' representations that all of Plaintiff's reasonable accommodations would be provided and he only needed to complete outpatient rotations to finish the Internship Program, a ray of light was cast upon Plaintiff's future as a dermatologist.

107.     Plaintiff reasonably relied upon the CHF Defendants' representations that all requested reasonable accommodations would be provided and that he would not need to complete anymore inpatient rotations. As a result of his reliance upon the CHF Defendants' representations, Plaintiff immediately settled the Collision Action at a significant discount and prepared to return to the Program.

108.     At the time of Dr. Pickard's deposition, neither he nor the remaining CHF Defendants intended to permit Plaintiff to complete the Program.

109.     Dr. Pickard's confirmation that CHF would provide all requested accommodations in his January 26, 2018 email was intentionally false. The CHF Defendants issued this communication with the intention of inducing Plaintiff to settle the Collision Action and to return to the Internship Program.

110.     Despite Plaintiff's explicitly stated understanding of Dr. Pickard's representations, the CHF Defendants never intended to provide the reasonable accommodations nor permit Plaintiff to complete the Program by completing only outpatient rotations.

111.   Despite never intending to allow Plaintiff to complete the Program, the CHF Defendants intentionally allowed Plaintiff to proceed with his explicitly stated understanding that he would receive the expected reasonable accommodations, including needing to only complete outpatient rotations to complete the Program, and would be permitted a fair opportunity to finish the Internship Program.

112.   The CHF Defendants' fraudulent and misleading intentions are confirmed by their counsel's conduct. The CHF Defendants, through their counsel in the Collision Action, forwarded Dr. Pickard's January 26, 2018 email to the driver's insurance appointed counsel in the Collision Action immediately after it was sent. Upon information and belief, the CHF Defendants and the insurance company, through their counsel, contrived to have Plaintiff return to the Program with the aim of having Plaintiff settle the Collision Action at a significant discount.

113.   Per Dr. Pickard's instruction, Plaintiff appeared at PSL on January 30, 2018 to report to the Program.

114.   Contrary to Dr. Pickard's representations, the Program was not prepared for his return. For approximately the next two weeks, Plaintiff was required to sit in a room by himself and had no patients to treat.

115.   On March 26, 2018, Plaintiff met with Dr. Pickard and his colleague to discuss Plaintiff's performance in his last rotation and his future plans.

116.   During this meeting, Dr. Pickard told Plaintiff that his email promising all reasonable accommodations did not mean anything. He further stated he made the promise for

20

the explicit purpose of inducing Plaintiff to return to the Program. Dr. Pickard also said that, despite the promises of reasonable accommodation, Plaintiff would need to complete inpatient rotations using the Meditech system in order to complete the Program.

117. The March 26, 2018 meeting was the first time since Plaintiff returned in January, 2018 that anyone mentioned that Plaintiff would need to complete an inpatient rotation to graduate from the Program.

118. Dr. Pickard's statement during this March 26, 2018 meeting that Plaintiff would be required to complete inpatient rotations confirms that the CHF Defendants intentionally and falsely promised to: (i) provide all requested reasonable accommodations, including allowing Plaintiff to complete the program by completing only outpatient rotations; and (ii) to allow Plaintiff an opportunity to complete the Program.

119. Dr. Pickard's statements in the March 26, 2018 meeting further confirm that the CHF Defendants did not intend to permit Plaintiff to complete the Program despite their January, 2018 representations to the contrary.

120. Nothing was said during the March 26, 2018 meeting that would indicate that Plaintiff had a limited amount of time to complete the Program.

121. The CHF Defendants are responsible for assigning interns to rotations. The CHF Defendants never offered Plaintiff an opportunity to complete an inpatient rotation with or without reasonable accommodation after his return in January, 2018.

122. On April 30, 2018, Dr. Pickard and others met with Plaintiff. During that meeting,

Plaintiff was informed that, as of June 23, 2018, the Program was being acquired by HCA (upon information and belief, the Healthcare Corporation of America), CHF would no longer offer the Internship Program, Plaintiff would not be receiving his certification of completion of the Internship Program, and that he would not have a spot in the Internship Program the following year. This was the first time Plaintiff learned any of this information or time constraints.

123.   Without receiving the certification of completion of the Internship Program, Plaintiff will not be able to obtain his medical license. Due to his impending non-completion of the Internship Program, Plaintiff would be required to re-apply with the NMRP in order to get re-matched with another transitional year program and residency. Due to the false and misleading information that the CHF Defendants disseminated to the NMRP and others, the loss of significant time attempting to complete the Internship Program which was inappropriately prolonged via the CHF Defendants' intentional delay, and Plaintiff's inability to create and submit another appropriate application, any attempt by Plaintiff to re-apply at this point is futile.

124.   During the April 30, 2018 meeting, Dr. Pickard further admitted that he knew about the timing issues long before Plaintiff returned to the Program in January, 2018. Nonetheless, the CHF Defendants never gave Plaintiff notice of these significant problems, nor did they ever give Plaintiff an opportunity to complete the Program with or without reasonable accommodations. The CHF Defendants purposefully concealed this information from Plaintiff.

125.   Through their pre-meditated and tortious conduct, the CHF Defendants intentionally delayed Plaintiff's reintegration into the Program and falsely promised to provide reasonable accommodations in their final move to destroy Plaintiff's medical career and his

ability to recover the amounts owing to him due to the car wreck. As evidenced by this delay and their intentional failure to inform Plaintiff of these purported significant time constraints, the CHF Defendants never intended to permit Plaintiff to complete the Internship Program upon his return in January, 2018.

126.    That the CHF Defendants intentionally sought to defraud Plaintiff from the damages he sought in the Collision Action is further confirmed by their conduct therein. The CHF Defendants were required to produce scores of documents. The CHF Defendants' document production was skewed and only aimed at producing potentially negative information regarding Plaintiff. Numerous emails that the CHF Defendants admitted were sent or received were never produced. Positive reviews that were admitted to have been created were never produced.

127.    The CHF Defendants also doctored, manipulated, or outright falsified notes and records relating to Plaintiff's performance and the contents of alleged meetings with Plaintiff. Upon information and belief, the CHF Defendants' counsel and the driver's insurance appointed counsel were further in contact regarding Dr. Pickard's second deposition and his confirmation regarding the CHF Defendants' false offer to provide reasonable accommodation. This suggests that the CHF Defendants and the driver's insurance company worked together to induce Plaintiff to forego trial in the Collision Action and settle his claims at a significant discount.

## FIRST CLAIM FOR RELIEF
### (Intentional Interference with Contract Against CHF Defendants)

128.    Plaintiff incorporates herein the foregoing paragraphs of the Complaint as if reinstated in full herein.

23

129.     Valid agreements existed between Plaintiff and the University of Iowa and NMRP.

130.     The CHF Defendants were aware of these agreements. In particular, the CHF Defendants were aware that the NMRP matched Plaintiff with the University of Iowa for a residency in dermatology.

131.     The CHF Defendants, by words and conduct, intentionally and wrongfully caused the University of Iowa and the NMRP to not perform and/or terminate their respective agreements with Plaintiff, and/or interfered with the University of Iowa and the NMRP's performance of their obligations under their respective agreements with Plaintiff.

132.     The CHF Defendants' interference was improper and was motivated by malice.

133.     The CHF Defendants' conduct damaged Plaintiff in an amount to be determined at trial, including without limitation, actual, incidental, consequential, and compensatory damages, and interest.

### SECOND CLAIM FOR RELIEF
**(Intentional Interference with Prospective Business Advantage
Against CHF Defendants)**

134.     Plaintiff incorporates herein the foregoing paragraphs of the Complaint as if reinstated in full herein.

135.     Plaintiff had a reasonable expectation of entering and completing the dermatology residency at the University of Iowa.

136.     Plaintiff also had a reasonable expectation of becoming a dermatologist.

137.     Plaintiff expected to derive significant pecuniary benefit from entering the

24

University of Iowa and becoming a dermatologist.

138.    The CHF Defendants intentionally and improperly interfered with Plaintiff's prospective business advantage of entering the University of Iowa and becoming a dermatologist.

139.    The CHF Defendants knew or reasonably should have known about Plaintiff's prospective business advantages.

140.    The CHF Defendants' conduct damaged Plaintiff in an amount to be determined at trial, including without limitation, actual, incidental, consequential, and compensatory damages, and interest.

**THIRD CLAIM FOR RELIEF**
**(Fraud Against CHF Defendants)**

141.    Plaintiff incorporates herein the foregoing paragraphs of the Complaint as if reinstated in full herein.

142.    The CHF Defendants made fraudulent misrepresentations of material fact to Plaintiff regarding his ability to return to the Internship Program in January, 2018 and the reasonable accommodations which would be provided upon his return.

143.    These fraudulent misrepresentations were made to Plaintiff both verbally and in writing, including, without limitation, via email.

144.    The CHF Defendants' fraudulent misrepresentations include Dr. Pickard's January 22, 2018 deposition testimony where he stated that Plaintiff could return to the Program with all

reasonable accommodations he requested and via Dr. Pickard's January 26, 2018 email confirming that all reasonable accommodations would be provided to Plaintiff.

145.   The CHF Defendants made these material promises and representations knowing they were false, or made them with a reckless disregard as to their truth or falsity.

146.   Plaintiff justifiably and actually relied upon these representations, which resulted in him foregoing his right to trial in the Collision Action, settling the claim in the Collision Action at a significant discount, and returning to the Internship Program.

147.   Plaintiff's reliance upon the CHF Defendants' misrepresentations caused him damage in an amount to be determined at trial, including without limitation, actual, incidental, consequential, and compensatory damages, and interest.

### FOURTH CLAIM FOR RELIEF
**(Negligent Misrepresentation Against CHF Defendants)**

148.   Plaintiff incorporates herein the foregoing paragraphs of the Complaint as if reinstated in full herein.

149.   The CHF Defendants made repeated misrepresentations of material fact to Plaintiff regarding his ability to return to the Internship Program in January, 2018 and the reasonable accommodations which would be provided upon his return.

150.   These repeated statements were made to Plaintiff both verbally and in writing.

151.   Plaintiff reasonably relied upon the CHF Defendants' misrepresentations, which directly caused Plaintiff to stop pursuing his claims in the Collision Action and returning to the

Internship Program.

152.   Plaintiff's reliance upon the CHF Defendants' misrepresentations caused him damage in an amount to be determined at trial, including without limitation, actual, incidental, consequential, and compensatory damages, and interest.

## FIFTH CLAIM FOR RELIEF
### (Promissory Estoppel Against CHF Defendants)

153.   Plaintiff incorporates herein the foregoing paragraphs of the Complaint as if reinstated in full herein.

154.   The CHF Defendants made various promises to Plaintiff regarding his ability to return to the Internship Program in January, 2018 and the reasonable accommodations which would be provided upon his return.

155.   The CHF Defendants intended, or at least reasonably should have expected, that their promises would induce action or forbearance by Plaintiff, including without limitation, foregoing his claims in the Collision Action.

156.   Plaintiff actually and justifiably relied upon such promises by the CHF Defendants to his detriment, and consequently suffered damages, and is entitled to an award of actual or compensatory damages, and/or restitution, and consequential damages all in amounts to be proven at trial.

## SIXTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against CHF Defendants)

157.   Plaintiff incorporates herein the foregoing paragraphs of the Complaint as if

27

reinstated in full herein.

158.   The CHF Defendants are Plaintiff's superiors, employers, instructors, and mentors.

159.   The CHF Defendants occupied a superior position over Plaintiff and were able to influence or affect his interests.

160.   The CHF Defendants repeatedly informed Plaintiff that all of their efforts were to ensure that Plaintiff "succeeds" at the Program.

161.   The CHF Defendants represented that they understood the sensitivity of Plaintiff's personal, sensitive, and confidential medical information. Indeed, two of the CHF Defendants are doctors, subject to various state and federal laws prohibiting the disclosure of patients' medical information.

162.   The CHF Defendants required Plaintiff to share his sensitive medical information.

163.   The CHF Defendants represented and promised that only Drs. Pickard and Dwinnell would have access to the information.

164.   The CHF Defendants assumed the fiduciary duty through their promises, by words and conduct, to keep Plaintiff's medical information confidential. Plaintiff, in reasonable reliance on these promises, provided certain sensitive medical information to the CHF Defendants in confidence. Based upon the CHF Defendants' position over Plaintiff and their conduct and representations, the CHF Defendants' relationship with Plaintiff induced Plaintiff to relax the care and vigilance one ordinarily would exercise in dealing with a stranger.

165.   The CHF Defendants owed Plaintiff a fiduciary duty to, including without limitation, maintain the confidentiality of his disabilities and medical information, and to not disclose that information to third-parties.

166.   The CHF Defendants further owed Plaintiff a fiduciary duty to not disclose false or misleading medical information regarding Plaintiff to third-parties.

167.   The CHF Defendants breached their fiduciary duty to Plaintiff by, without limitation, disclosing his medical information to the University of Iowa and the NMRP.

168.   The CHF Defendants breached their fiduciary duty to Plaintiff by, without limitation, disclosing incorrect medical information to the University of Iowa and the NMRP.

169.   The CHF Defendants' breach of their fiduciary duty caused Plaintiff damage in an amount to be determined at trial, including without limitation, actual, incidental, consequential, and compensatory damages, and interest.

### SEVENTH CLAIM FOR RELIEF
**(Civil Conspiracy Against CHF Defendants)**

170.   Plaintiff incorporates herein the foregoing paragraphs of the Complaint as if reinstated in full herein.

171.   The CHF Defendants agreed by words and conduct, to an unlawful goal by unlawful means. The CHF Defendants' agreement is supported by, including without limitation, their working jointly and in concert to interfere with Plaintiff's contracts with the University of Iowa and the NMRP, to fraudulently induce Plaintiff to return to the Program, and/or with the knowledge and ratification of the other's unlawful conduct.

29

172.   The CHF Defendants' conspiracy has damaged Plaintiff in an amount to be determined at trial, including without limitation, actual, incidental, consequential, and compensatory damages, and interest.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

WHEREFORE, Plaintiff Trevor L. Jones respectfully requests that the Court enter judgment in his favor and against Defendants HealthONE d/b/a The Colorado Health Foundation, Jeffrey Pickard, M.D., Brian G. Dwinnell, M.D., and Glenn Levy, jointly and severally, on the claims set forth above, enter the requested relief set forth above for each claim, award him his attorneys' fees and costs, and for such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 15th day of June 2018.

**GOODSPEED & MERRILL**

*/s/ Miro Kovacevic*
Miro Kovacevic, #35981
*Counsel for Plaintiff Trevor L. Jones*

**Plaintiff's address:**
10447 North Sky Drive
Lone Tree, Colorado 80124



**UNIVERSITY OF IOWA**
**HEALTH CARE**

*Department of Dermatology*

*Residency Program*
*200 Hawkins Drive, 40026 PFP*
*Iowa City, IA 52242*
*319-356-1494 Tel*
*https://uiowa.edu/dermatology-residency*

DATE FILED: June 15, 2018 10:38 AM
FILING ID: 1ECFC9BF96824
CASE NUMBER: 2018CV32237

November 22, 2016

Trevor Jones, MD
10447 N. Sky Drive
Lone Tree, CO 80124

Dear Trevor,

As you know, Drs. Picard, Dwinnell and Levy contacted me to make me aware of the
accommodations you are receiving during your internship.

Please let me know the circumstances of your situation including any current
accommodations being provided, so that we can properly understand and assess the situation.

Sincerely,

Mary Stone, MD
Program Director, Dermatology Residency

MS/cm

**EXHIBIT 1**

DATE FILED: June 15, 2018 10:37 AM
FILING ID: 1ECFC9BF96824
CASE NUMBER: 2018CV32237

---------- Forwarded message ----------
From: **Stone, Mary** <mary-stone@uiowa.edu>
Date: Fri, Jan 13, 2017 at 10:58 AM
Subject: Update
To: "Trevor Jones (trejones1987@gmail.com)" <trejones1987@gmail.com>

Dear Trevor,

Regarding your prior email regarding your working through some issues, do you have an update for us? As patient safety must be our first priority, and all residents must be able to successfully complete all aspects of training in order to safely care for patients, please let us know if any of these issues could impact your training.

Sincerely,

Mary Stone

Notice: This UI Health Care e-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete or destroy all copies of the original message and attachments thereto. Email sent to or from UI Health Care may be retained as required by law or regulation. Thank you.

1

**EXHIBIT 2**

DATE FILED: June 15, 2018 10:37 AM
FILING ID: 1ECFC9BF96824
CASE NUMBER: 2018CV32237

---------- Forwarded message ----------
From: **Stone, Mary** <mary-stone@uiowa.edu>
Date: Fri, Mar 17, 2017 at 3:06 PM
Subject: Iowa
To: "Trevor Jones (trejones1987@gmail.com)" <trejones1987@gmail.com>

---

Notice: This UI Health Care e-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete or destroy all copies of the original message and attachments thereto. Email sent to or from UI Health Care may be retained as required by law or regulation. Thank you.

**EXHIBIT 3**



**UNIVERSITY of IOWA
HEALTH CARE**

*Department of Dermatology*

*Roy J. and Lucille A.
Carver College of Medicine)
200 Hawkins Drive, 40038 PFP
Iowa City, IA  52242-1090
(319) 356-2274 Tel
(319) 356-8317 Fax
http://www.uihealthcare.com/depts/med/dermatology/*

March 17, 2017

Dear Trevor,

I have been in touch with Becky Iliff, UI Health Care Leave and Disability Administrator, regarding her communications with you about accommodations.  Becky informs me that you are currently undergoing some testing, but that you have not yet provided the medical information she requested on January 25, 2017, to assist us in identifying potentially appropriate accommodations.

First, I am very sorry for the difficulties you have experienced and hope that we can find a way for you to be successful.  However, based on comments you made to me regarding dexterity limitations in your hand and information shared with me by Drs. Picard, Dwinnell, and Levy about visual limitations, I am concerned about your ability to perform the essential functions associated with your residency.  I am told that your visual issues are such that you cannot easily interact with your inpatient EMR. As you know, visual acuity is critical in dermatology for patient exams, pathologic diagnosis and surgical therapies. Visual impairment in a dermatologist has potential to be a major patient safety issue. For example, lack of the ability to recognize subtle visual features can be the difference between finding a melanoma in an early curable phase and allowing it to remain undiagnosed with potentially fatal outcome.

Every day in clinic, one has to do thin shave biopsies accurately as to not injure nearby structures and do punch biopsies and suture them closed. Moreover, one must be able to close surgical wounds near the eye with 6-0 suture and examine and accurately interpret pathology specimens.  This requires both visual and manual acuity. Dermatology is a specialty in which normal visual acuity with a reasonable amount of preserved visual field is required to practice safely and effectively.  Becky shared with you the Technical Standards for Admission and Retention which states that all trainees "must have the functional ability to observe and must have sufficient use of the senses necessary to perform all necessary physical examination and patient care pursuant to their specialized area of training". Based on the information shared with me, we need information from you about potential accommodations promptly.  Please respond by email no later than March 27, attaching the documentation requested by Becky in her January 25, 2017 correspondence and a description of how you plan to perform the essential functions of this position, including any accommodations you may require.

If you do not wish to discuss accommodations and/or your ability to meet the essential position requirements, you have the option of pursuing a waiver through the National Resident Matching Program to terminate the residency commitment and thus release both yourself and the UIHC.

http://www.nrmp.org/policies/the-match-commitment/#waivers

**EXHIBIT 3**

If I do not hear from you by April 5 indicating that you are capable of performing all necessary patient care pursuant to dermatology training or if you have not sought a waiver by April 5, we will proceed to initiate the waiver process through NRMP.

Again, I cannot express how badly all of us feel for what you are going through, and we would be happy to discuss these issues with you.

Sincerely,

*Mary S. Stone MD*

Mary S. Stone, MD
Mary Jo Godwin Professor of Dermatology and Pathology
Program Director, Dermatology


cc:     Becky Iliff
bcc:    Dr. Mark Wilson
        Cynthia Geyer, J.D., M.A.

**EXHIBIT 3**

DATE FILED: June 15, 2018 10:37 AM
FILING ID: 1ECFC9BF96824
CASE NUMBER: 2018CV32237

---------- Forwarded message ----------
From: **Trevor Jones** <trejones1987@gmail.com>
Date: Tue, Jan 23, 2018 at 2:57 PM
Subject: Thank You!
To: "Jeffrey.Pickard@HealthONEcares.com" <Jeffrey.Pickard@healthonecares.com>

Dear Dr Picard,


Thank you for your kind words about me yesterday in your deposition. I also want to thank you for committing unconditionally to agreeing to all the reasonable accommodations I need to return promptly to finish my internship.


As Dr. Schaff stated on 07/06/2017, same accommodation and structure I received in outpatient block  including but not limited to:


- eClinicals EMR
- 36  hours week
- 5 days a week no weekends
- start & end times, 8am to 4pm
- 2-3 patient cap
- No nights
- Dragon
- rest time if needed


Your testimony promising to return me to this program in one week, with all my accommodations accepted, is a huge weight off my mind. All I need is an opportunity. I won't let you down. My phone number is 303-482-1168. Let me know when I can return and complete.

Thanks,

Trevor

1

**EXHIBIT 4**

DATE FILED: June 15, 2018 10:37 AM
FILING ID: 1ECFC9BF96824
CASE NUMBER: 2018CV32237

---------- Forwarded message ----------
From: <Jeffrey.Pickard@healthonecares.com>
Date: Fri, Jan 26, 2018 at 12:05 PM
Subject: Return to work
To: trejones1987@gmail.com
Cc: jonathan.manheim@ucdenver.edu, ELISABETH.IHLER@ucdenver.edu, mhannon@coloradohealth.org, glevy@coloradohealth.org, Brett.Painter@dgslaw.com

Trevor,


Thank you for your email. While I disagree with some of your characterizations, I appreciate the information you have provided, and we are prepared for your return to the program.


Please meet Dr. Ihler at Uptown Primary Care Clinic on Tuesday, January 30, 2018 at 8 AM to start your next rotation, which will be outpatient internal medicine and will implement the accommodations you requested in your email.


Have a good weekend and we'll see you next week.


Jeffrey Pickard, MD, FACP

Director, Transitional Internship

The Colorado Health Foundation

Associate Professor of Medicine

University of Colorado, Denver

1721 E. 19th Ave, Suite 520

Denver, Colorado 80218

Main: 303-839-6741

**EXHIBIT 5**

Fax: 303-869-2258

Jeffrey.pickard@healthonecares.com

2

**EXHIBIT 5**

| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER STATE OF COLORADO**<br><br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: June 15, 2018 10:37 AM<br>FILING ID: 1ECFC9BF96824<br>CASE NUMBER: 2018CV32237 |
| **PLAINTIFF:**<br>TREVOR L. JONES, an individual,<br><br>v.<br><br>**DEFENDANTS:**<br>HEALTHONE d/b/a THE COLORADO HEALTH FOUNDATION, a Colorado nonprofit corporation; JEFFREY PICKARD, an individual; BRIAN G. DWINNELL, an individual; and GLENN LEVY, an individual. | |
| **ATTORNEYS FOR PLAINTIFF:**<br>GOODSPEED & MERRILL<br>Miro Kovacevic, #35981<br>Scott W. Drusch, #42494<br>7800 East Union Avenue, Suite 600<br>Denver, CO 80237<br>Telephone: (720) 473-7644<br>Email: mk@goodspeedmerrill.com<br>          sdrusch@goodspeedmerrill.com | Case No.  2018CV<br><br>Ctrm./Div. |
| **DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT** | |

1. **This cover sheet shall be filed with each pleading containing an initial claim for relief in every district court civil (CV) case, and shall be served on all parties along with the pleading.**  It shall not be filed in Domestic Relations (DR), Probate (PR), Water (CW), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases.  Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2.   Check one of the following:

❏ This case is governed by C.R.C.P. 16.1 because:

- The case is not a class action, domestic relations case, juvenile case, mental health case, probate case, water law case, forcible entry and detainer, C.R.C.P. 106, C.R.C.P. 120, or other similar expedited proceeding; *AND*

- A monetary judgment over $100,000 is not sought by any party against any other single party. This amount includes attorney fees, penalties, and punitive damages; it excludes interest and costs, as well as the value of any equitable relief sought.

☒ This case is not governed by C.R.C.P. 16.1 because (check ALL boxes that apply):

❏     The case is a class action, domestic relations case, juvenile case, mental health case, probate case, water law case, forcible entry and detainer, C.R.C.P. 106, C.R.C.P. 120, or other similar expedited proceeding.

☒     A monetary judgment over $100,000 is sought by any party against any other single party. This amount includes attorney fees, penalties, and punitive damages; it excludes interest and costs, as well as the value of any equitable relief sought.

❏     Another party has previously indicated in a Case Cover Sheet that the simplified procedure under C.R.C.P. 16.1 does not apply to the case.

*NOTE: In any case to which C.R.C.P. 16.1 does not apply, the parties may elect to use the simplified procedure by separately filing a Stipulation to be governed by the rule within 49 days of the at-issue date. See C.R.C.P. 16.1(e). In any case to which C.R.C.P. 16.1 applies, the parties may opt out of the rule by separately filing a Notice to Elect Exclusion (JDF 602) within 35 days of the at-issue date. See C.R.C.P. 16.1(d).*

❏ A Stipulation or Notice with respect to C.R.C.P. 16.1 has been separately filed with the Court, indicating:

❏ C.R.C.P. 16.1 applies to this case.

❏ C.R.C.P. 16.1 does not apply to this case.

**3.** ☒   This party makes a **Jury Demand** at this time and pays the requisite fee. *See* C.R.C.P. 38. (Checking this box is optional.)

Dated: June 15, 2018.

**GOODSPEED & MERRILL**

By: *s/Miro Kovacevic*
    Miro Kovacevic, #35981
    *Attorneys for Plaintiff*

| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER** <br> **STATE OF COLORADO** <br><br> 1437 Bannock Street <br> Denver, CO 80202 | DATE FILED: June 15, 2018 10:37 AM <br> FILING ID: 1ECFC9BF96824 <br> CASE NUMBER: 2018CV32237 |
| **PLAINTIFF:** <br> TREVOR L. JONES, an individual, <br><br> v. <br><br> **DEFENDANTS:** <br> HEALTHONE d/b/a THE COLORADO HEALTH FOUNDATION, a Colorado nonprofit corporation; JEFFREY PICKARD, an individual; BRIAN G. DWINNELL, an individual; and GLENN LEVY, an individual. | |
| **ATTORNEYS FOR PLAINTIFF:** <br> GOODSPEED & MERRILL <br> Miro Kovacevic, #35981 <br> Scott W. Drusch, #42494 <br> 7800 East Union Avenue, Suite 600 <br> Denver, CO 80237 <br> Telephone: (720) 473-7644 <br> Email: mk@goodspeedmerrill.com <br>         sdrusch@goodspeedmerrill.com | Case No.  2018CV <br><br> Ctrm./Div. |
| **DISTRICT COURT CIVIL SUMMONS** | |

**TO THE ABOVE NAMED DEFENDANT:**    **Healthone d/b/a The Colorado Health Foundation**

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other response to the attached Complaint.  If service of the Summons and Complaint was made upon you within the State of Colorado, you are required to file your answer or other response within 21 days after such service upon you.  If service of the Summons and Complaint was made upon you outside of the State of Colorado, you are required to file your answer or

other response within 35 days after such service upon you. Your answer or counterclaim must be accompanied with the applicable filing fee.

If you fail to file your answer or other response to the Complaint in writing within the applicable time period, the Court may enter judgment by default against you for the relief demanded in the Complaint without further notice.

Dated: June 15, 2018.

GOODSPEED & MERRILL

By: _s/Miro Kovacevic_
Miro Kovacevic, #35981
*Attorneys for Plaintiff*

**WARNING:** A valid summons may be issued by a lawyer and it need not contain a court case number, the signature of a court officer, or a court seal. The plaintiff has 14 days from the date this summons was served on you to file the case with the court. You are responsible for contacting the court to find out whether the case has been filed and obtain the case number. If the plaintiff files the case within this time, then you must respond as explained in this summons. If the plaintiff files more than 14 days after the date the summons was served on you, the case may be dismissed upon motion and you may be entitled to seek attorney's fees from the plaintiff.

| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER STATE OF COLORADO**<br><br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: June 15, 2018 10:37 AM<br>FILING ID: 1ECFC9BF96824<br>CASE NUMBER: 2018CV32237 |
| **PLAINTIFF:**<br>TREVOR L. JONES, an individual,<br><br>v.<br><br>**DEFENDANTS:**<br>HEALTHONE d/b/a THE COLORADO HEALTH FOUNDATION, a Colorado nonprofit corporation; JEFFREY PICKARD, an individual; BRIAN G. DWINNELL, an individual; and GLENN LEVY, an individual. | |
| **ATTORNEYS FOR PLAINTIFF:**<br>GOODSPEED & MERRILL<br>Miro Kovacevic, #35981<br>Scott W. Drusch, #42494<br>7800 East Union Avenue, Suite 600<br>Denver, CO 80237<br>Telephone: (720) 473-7644<br>Email: mk@goodspeedmerrill.com<br>        sdrusch@goodspeedmerrill.com | Case No.  2018CV<br><br>Ctrm./Div. |
| **DISTRICT COURT CIVIL SUMMONS** | |

**TO THE ABOVE NAMED DEFENDANT:**      **Jeffrey Pickard**

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other response to the attached Complaint. If service of the Summons and Complaint was made upon you within the State of Colorado, you are required to file your answer or other response within 21 days after such service upon you. If service of the Summons and Complaint was made upon you outside of the State of Colorado, you are required to file your answer or

other response within 35 days after such service upon you.  Your answer or counterclaim must be accompanied with the applicable filing fee.

If you fail to file your answer or other response to the Complaint in writing within the applicable time period, the Court may enter judgment by default against you for the relief demanded in the Complaint without further notice.

Dated: June 15, 2018.

**GOODSPEED & MERRILL**

By: *s/Miro Kovacevic*
      Miro Kovacevic, #35981
      *Attorneys for Plaintiff*

**WARNING:**  A valid summons may be issued by a lawyer and it need not contain a court case number, the signature of a court officer, or a court seal.  The plaintiff has 14 days from the date this summons was served on you to file the case with the court.  You are responsible for contacting the court to find out whether the case has been filed and obtain the case number.  If the plaintiff files the case within this time, then you must respond as explained in this summons.  If the plaintiff files more than 14 days after the date the summons was served on you, the case may be dismissed upon motion and you may be entitled to seek attorney's fees from the plaintiff.

2

| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER**<br>**STATE OF COLORADO**<br><br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: June 15, 2018 10:37 AM<br>FILING ID: 1ECFC9BF96824<br>CASE NUMBER: 2018CV32237 |
| **PLAINTIFF:**<br>TREVOR L. JONES, an individual,<br><br>v.<br><br>**DEFENDANTS:**<br>HEALTHONE d/b/a THE COLORADO HEALTH<br>FOUNDATION, a Colorado nonprofit corporation;<br>JEFFREY PICKARD, an individual; BRIAN G.<br>DWINNELL, an individual; and GLENN LEVY, an<br>individual. | |
| **ATTORNEYS FOR PLAINTIFF:**<br>GOODSPEED & MERRILL<br>Miro Kovacevic, #35981<br>Scott W. Drusch, #42494<br>7800 East Union Avenue, Suite 600<br>Denver, CO 80237<br>Telephone: (720) 473-7644<br>Email: mk@goodspeedmerrill.com<br>        sdrusch@goodspeedmerrill.com | Case No.  2018CV<br><br>Ctrm./Div. |

## DISTRICT COURT CIVIL SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**      **Brian G. Dwinnell**

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other response to the attached Complaint. If service of the Summons and Complaint was made upon you within the State of Colorado, you are required to file your answer or other response within 21 days after such service upon you. If service of the Summons and Complaint was made upon you outside of the State of Colorado, you are required to file your answer or

other response within 35 days after such service upon you.  Your answer or counterclaim must be accompanied with the applicable filing fee.

If you fail to file your answer or other response to the Complaint in writing within the applicable time period, the Court may enter judgment by default against you for the relief demanded in the Complaint without further notice.


Dated: June 15, 2018.

**GOODSPEED & MERRILL**

By: *s/Miro Kovacevic*
        Miro Kovacevic, #35981
        *Attorneys for Plaintiff*


**WARNING:**  A valid summons may be issued by a lawyer and it need not contain a court case number, the signature of a court officer, or a court seal.  The plaintiff has 14 days from the date this summons was served on you to file the case with the court.  You are responsible for contacting the court to find out whether the case has been filed and obtain the case number.  If the plaintiff files the case within this time, then you must respond as explained in this summons.  If the plaintiff files more than 14 days after the date the summons was served on you, the case may be dismissed upon motion and you may be entitled to seek attorney's fees from the plaintiff.

| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER STATE OF COLORADO**<br><br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: June 15, 2018 10:37 AM<br>FILING ID: 1ECFC9BF96824<br>CASE NUMBER: 2018CV32237 |
| **PLAINTIFF:**<br>TREVOR L. JONES, an individual,<br><br>v.<br><br>**DEFENDANTS:**<br>HEALTHONE d/b/a THE COLORADO HEALTH FOUNDATION, a Colorado nonprofit corporation; JEFFREY PICKARD, an individual; BRIAN G. DWINNELL, an individual; and GLENN LEVY, an individual. | |
| **ATTORNEYS FOR PLAINTIFF:**<br>GOODSPEED & MERRILL<br>Miro Kovacevic, #35981<br>Scott W. Drusch, #42494<br>7800 East Union Avenue, Suite 600<br>Denver, CO 80237<br>Telephone: (720) 473-7644<br>Email: mk@goodspeedmerrill.com<br>      sdrusch@goodspeedmerrill.com | Case No.  2018CV<br><br>Ctrm./Div. |
| **DISTRICT COURT CIVIL SUMMONS** | |

**TO THE ABOVE NAMED DEFENDANT:**    **Glenn Levy**

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other response to the attached Complaint. If service of the Summons and Complaint was made upon you within the State of Colorado, you are required to file your answer or other response within 21 days after such service upon you. If service of the Summons and Complaint was made upon you outside of the State of Colorado, you are required to file your answer or

other response within 35 days after such service upon you.  Your answer or counterclaim must be accompanied with the applicable filing fee.

If you fail to file your answer or other response to the Complaint in writing within the applicable time period, the Court may enter judgment by default against you for the relief demanded in the Complaint without further notice.


Dated: June 15, 2018.

GOODSPEED & MERRILL

By: *s/Miro Kovacevic*
Miro Kovacevic, #35981
*Attorneys for Plaintiff*


**WARNING:**  A valid summons may be issued by a lawyer and it need not contain a court case number, the signature of a court officer, or a court seal.  The plaintiff has 14 days from the date this summons was served on you to file the case with the court.  You are responsible for contacting the court to find out whether the case has been filed and obtain the case number.  If the plaintiff files the case within this time, then you must respond as explained in this summons.  If the plaintiff files more than 14 days after the date the summons was served on you, the case may be dismissed upon motion and you may be entitled to seek attorney's fees from the plaintiff.